AMIGO COAL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 11684.    Promulgated October 7, 1927.

1. A reserve of $5,000 entered upon the petitioner's books in the
year 1920 represents the amount which it believed would be neces-
sary for it to expend in the subsequent year for the removal of rock
and slate from the roof of its mine to permit of continued coal-
mining operations. The work of removing the rock and slate was
performed in the year 1921 and the cost of such work amounted to
$5,926.67. *Held,* that the cost of this work was not incurred in the
year 1920 and the reserve was not a proper deduction from gross
income in that year.

2. The evidence in this proceeding shows that the petitioner
determined a debt of $44,443.40 to have been wholly worthless in
December, 1920. It charged off within the year 1920 $15,608.52
thereof. *Held,* the Commissioner erred in refusing to allow the
petitioner to deduct the amount charged off.

*E. J. Goodrich, Esq.,* for the petitioner.
*Maxwell E. McDowell, Esq.,* for the respondent.

The Commissioner determined a deficiency of $3,818.98 for the
calendar year 1920. The deficiency notice shows no deficiencies for
the calendar years 1921 to 1923, inclusive. Prior to the determina-
tion of the Commissioner of the deficiency for 1920, petitioner filed
a claim for the abatement of a portion of a tax originally assessed
by reason of which it claims the tax in controversy in this proceeding
is $13,302.78.

The errors urged at the hearing are that the Commissioner erred
(1) in disallowing as a deduction for 1920 a reserve in the amount of
$5,000 entered upon the petitioner's books in that year for the removal
of rock from its coal mine, which amount it is claimed would have
been expended in the year 1920 but for the delay in obtaining repair
parts for automatic drills which made it necessary to do this work
in the year 1921, and (2) in failing to allow a deduction of $15,608.52
representing that portion of a debt for $44,443.40 determined to have
been worthless and charged off within the taxable year 1920.

### FINDINGS OF FACT.

Petitioner is a West Virginia corporation engaged in mining and
selling coal with principal office at Amigo, Raleigh County, of that
State.

The mine operated by petitioner is a very low seam of coal ranging
from 26 to 40 inches in thickness. It is necessary in the operation
of this mine for the petitioner, as the extraction of coal progresses, to
remove by the process of blasting, a considerable portion of sand-

stone and slate roof of the mine to permit the erection of trolley wires and the operation of mine cars. Entries into the mine for the extraction of coal can not be advanced very far without the removal of the rock roof of the mine entry so as to permit of advancement of transportation facilities. Throughout the year 1920 petitioner had an arrangement with its miners whereby it paid them $5 a yard for the removal of a sufficient thickness of the sandstone and slate roof of the mine to permit of the proper operation of the mine. For the purpose of blasting this rock roof an automatic drill was used. The use of hand drills for this purpose was impracticable for the reason that the drilling had to be done overhead and because of the hardness of the stone. In or about December, 1920, the automatic drill became broken and the petitioner was unable, after repeated efforts during the remainder of that year, to obtain a new drill or proper repair parts for the drill which had been in use. Petitioner carried on its mining operations during the remainder of December, 1920, as best it could without any further removal of the rock and on December 31, 1920, there were 1,185⅓ yards of mine entry from which it would be necessary to remove the roof before it would be practicable to continue successful mining operations. At December 31, 1920, petitioner estimated the number of yards of stone roof which would have to be removed at a cost of $5 a yard and entered upon its books a reserve of $5,000 for this work. The repair parts for the automatic drill were finally secured and early in 1921 the 1,185⅓ yards of rock roof were removed at an actual cost of $5,926.67. Petitioner claims this amount is a deduction from gross income for the year 1920 upon the ground that the cost of this work, which it knew it would have to do before successful mining operations could be continued, was an accrued expense in the year 1920. The Commissioner refused to allow the deduction of this reserve upon the ground that the setting up of reserves of this character is not permitted by the Revenue Act of 1918 and that the cost of removing the stone was neither paid nor incurred within the taxable year 1920.

Some time in July, 1920, when the demand for coal was great and coal was selling at high prices, petitioner entered into a contract with the Interstate Coal & Dock Co., hereinafter referred to as the Interstate Company, a corporation engaged in the sale of coal with principal office at Green Bay, Wis., whereby the Interstate Company agreed to purchase petitioner's entire output of coal. The Interstate Company also had branch offices or representatives in New York, N. Y., Chicago, Ill., in Richmond and Norfolk, Va., Beckley, W. Va., and at other coal-shipping points. This company was engaged exclusively as a coal-selling organization and had no assets other than coal contracts, and operated on a very small margin of cash. In

the contract with petitioner the Interstate Company agreed to purchase petitioner's entire output at $4.50 a ton. This contract also provided that in the event petitioner was compelled to increase the wages of its employees engaged in mining coal that the purchase price per ton to the Interstate Company would be increased accordingly. The Interstate Company had many contracts with many coal-operating companies. It had contracts to purchase the output of practically all of the coal mining companies in the West Virginia field. In these contracts the Interstate Company agreed to make payment for coal shipped in the latter part of the month following the month in which shipment was made. Petitioner made shipments of coal to and received payments from the Interstate Company during the year 1920 as follows:

| Month | Shipments | Payments |
|-------|-----------|----------|
| July | $6,981.21 | None. |
| August | 21,804.53 | None. |
| September | 24,915.60 | $27,022.50 |
| October | 20,592.98 | 25,292.28 |
| November | 21,279.40 | 19,763.24 |
| December | 20,947.70 | None. |
| Total | 116,521.42 | 72,078.02 |

This left a balance due petitioner by the Interstate Company of $44,443.40.

In September or October, 1920, a slump in the coal market occurred and the price of coal declined materially. The Interstate Company therefore found itself with numerous contracts wherein it had agreed to purchase coal at high prices and with a large supply of coal on hand for which there was very little demand. It had difficulty in selling coal and that which it could sell was in most instances sold at prices considerably below the price at which it was compelled under its contracts to pay the operator. The Interstate Company relied upon payments to it for coal sold with which to pay for coal purchased and at no time had a very large amount of ready cash on hand with which to meet its bills. In the latter part of September or in October, 1920, the Interstate Company finding itself unable to meet its bills gave trade acceptances and subsequently made part payments thereon. Early in December, 1920, the Interstate Company was hopelessly insolvent, its trade acceptances were protested and it was unable, after December 15, 1920, to make payments on coal which had theretofore been shipped to it. More than $339,000 of trade acceptances held by operators in the West Virginia field alone were protested for nonpayment early in December, 1920. In the latter part of November, and throughout the month of December, 1920, petitioner made every effort to collect on its

accounts but could get no remittances. It wrote letters and sent telegrams to the principal office of the petitioner and to its New York office but could get no reply. Petitioner's secretary and manager who was in charge of its operations and financial affairs did everything he could without personally going to Green Bay, Wis., to collect the amount due petitioner from the Interstate Company. He knew that the sudden drop in coal prices and the lack of demand for coal had caused the Interstate Company to become financially involved and that this was the reason for his company not receiving payments in full for coal which had been shipped to the Interstate Company. He made several trips from Amigo to Beckley, W. Va., in an effort to confer with the representative of the Interstate Company in that territory with the view of seeing if anything could be done to have the Interstate Company make payment of its past due accounts. He was never able to see the Interstate Company's representative. None of the coal operators in the West Virginia field were able to collect anything on their accounts. About the middle of December, 1920, petitioner determined that the Interstate Company was hopelessly insolvent, could not pay anything upon its large outstanding indebtedness, and that the debt of $44,443.40 due it by the Interstate Company was worthless and a total loss. Before charging the amount off on the books of account, however, petitioner's secretary and manager, being uninformed as to income-tax matters and being desirous of strictly complying with the law and Department regulations, sought information from those whom he believed knew something about the matter of charging off worthless debts insofar as such action related to income-tax matters. He consulted certain individuals who had previously been connected with the handling of some tax questions, explained the circumstances to them, told them that the debt of the Interstate Company of $44,443.40 was worthless and an absolute loss to his company, and asked if, under these circumstances, the total debt might under the income-tax statutes and regulations be legally charged off as worthless without subjecting the company to a penalty. Petitioner's officer was advised by those with whom he consulted that their understanding of the matter of charging off worthless debts from an income-tax standpoint was that before a debt could legally be charged off the debtor must have gone through bankruptcy and that every possible means to collect on the account must first have been exhausted. After being thus informed petitioner, although desirous of charging the debt off in full, concluded that the best it could do and stay within the regulations of the Treasury Department was to charge to profit and loss the amount of $15,608.52, which represented the profit at which the company had sold the coal, and carry the remainder of

the account, amounting to $28,834.88, into the inventory as a part of the cost of goods sold. This effect of the treatment of the debt by the petitioner upon its books is explained by its principal officer that his " job was to dig that coal out of the hillside and get what I could for it. I could not understand the law on that [charging off of the debt] * * *. I asked everybody I could find, and some of them said ' well, you can take off your profit, as a net loss, or you can take your inventory at your cost of production, inventory your coal at cost of production or market value,' and I decided to do that, and I came to the conclusion that if we put in the inventory the cost which was above the market, and then take no credit to profit, that that at least would be subject to a fair interpretation that I was not trying to make a fraudulent return. Now, that is where I got that $15,608.52. The average cost of production that we could turn that in and charge the rest of it off."

Shortly after December 31, 1920, before the books were closed for that year the petitioner charged $15,608.52 of the $44,443.40 off as worthless. The Commissioner refused to allow any deduction on account of the debt of the Interstate Company. Petitioner employed the accrual method of accounting. The affairs of the Interstate Company were wound up by a court in bankruptcy some time in 1921. Petitioner filed its claim for $44,443.40 in the bankruptcy proceeding and the trustee in bankruptcy reduced the same in the amount of $9,543.34 on the ground that the contract price of coal with the Interstate Company was $4.50 a ton and declined to permit the petitioner to add 50 cents a ton under the contract on account of increase in the wages of miners prior to the shipment of the coal in question. Nothing was ever paid to the petitioner on account of the debt of the Interstate Company.

### OPINION.

LITTLETON: No portion of the work representing a claim of expenditure of $5,926.67 was performed in the year 1920. At the end of the year 1920 the petitioner had incurred no liability to any one in respect of the amount which might be necessary to remove the roof of the mine. Petitioner claims that the expenditure of this amount was " incurred " in the year 1920 because it knew at the close of 1920 that in order to proceed with its mining operations in the year 1921 it would be necessary for it to pay this amount, but knowledge of a taxpayer that some expenditure, even though determinable in amount, will have to be paid or incurred in the following year for certain work necessary, if its operations are continued, is not sufficient to justify a deduction of such amount in the taxable year in which it is neither paid nor liability therefor incurred. In these circumstances we are of the opinion that the reserve was not a proper deduc-

ROBERT W. BINGHAM. **603**

tion from gross income. *William J. Ostheimer*, 1 B. T. A. 18; *Consolidated Asphalt Co.*, 1 B. T. A. 79; *Uvalde Co.*, 1 B. T. A. 932; *Morrison-Ricker Manufacturing Co.*, 2 B. T. A. 1008; *H. V. Greene Co.*, 5 B. T. A. 442; *Hirst & Begley Linseed Co.*, 4 B. T. A. 1160.

The Board is of the opinion that the Commissioner was in error in declining to allow the petitioner a deduction of any amount in the year 1920 on account of the debt of the Interstate Coal & Dock Co. The debt was wholly worthless and was so determined within the taxable year, and $15,608.52 was charged off in the return. In the petition only $15,608.52 is claimed as a deduction. The amount claimed, to wit, $15,608.52, was a proper deduction from the gross income for 1920. *Mason Machine Works Co.*, 3 B. T. A. 745, and *Higginbotham-Bailey-Logan Co.*, 8 B. T. A. 566.

The petitioner claims that because the trustee in bankruptcy reduced its claim of $44,443.40 by the amount of $9,543.34, representing the amount of 50 cents a ton added to the price mentioned in the contract on account of an increase in the miners' wages occurring prior to shipment of the coal in question, its income from sales should be correspondingly reduced, but the evidence is not sufficient to warrant us in holding that this should be done. The evidence submitted by the petitioner is to the effect that the contract with the Interstate Company specifically provided that the Interstate Company would pay $4.50 a ton for the coal and that this price should be increased by whatever amount should be necessary to take care of any increase which the petitioner might be compelled to make in the wages of its miners.

Reviewed by the Board.

*Judgment will be entered on 15 days' notice, under Rule 50.*